OPINION OF THE COURT
Renée Forgensi Minarik, J.
On October 5, 1995, in the Town of Lancaster, Paul LaMendola Sr. lost control of his 1991 Lincoln and slid into an unoccupied dump truck parked on the right shoulder of the westbound side of the New York State Thruway. The crash killed Mr. LaMendola, his wife Deborah, and two of their four children, Nicholas and Chesa. The two youngest children, Lauren and Paul Jr., were injured in the crash, but survived. In a decision filed June 30, 2000, the Honorable John P Lane determined that defendant’s negligence was the proximate cause of the accident and that defendant was 100% liable for damages. This decision addresses the damages portion of this claim.
Claimants request damages for pain and suffering for Paul Sr. and Deborah LaMendola, Nicholas LaMendola and Chesa LaMendola; damages for the wrongful death of Paul Sr. and Deborah LaMendola, Nicholas LaMendola and Chesa LaMendola; and damages for the personal injuries sustained by Lauren LaMendola and Paul LaMendola Jr. In addition, claimants have requested a damages award for Marie LaMendola Cannizzaro, Paul Sr.’s daughter from a prior marriage, for the loss of her father and half siblings.
Introduction
It became clear to me within the first two days of trial that this would be no ordinary battle of fact and law, but instead would be an odyssey into the emotions, disappointments and destruction of what were once solid familial relationships. The backdrop to this case is not so much the horrendous auto accident as much as it is the story of two children who covet precious little original memories of their once intact nuclear family, memories that have melded with the memories that other people possess of Lauren’s and Paul Jr.’s parents and siblings. Justice can be achieved and their memories preserved without sorting out from whence these memories came; the attorneys in this trial have provided ample objective evidence regarding what Lauren’s and Paul Jr.’s lives were like before the accident and what their lives have been like since the accident.
With the benefit of testimony from well-qualified experts on both sides, friends, family, caregivers and educators, I estab *390 lished damages for the more commonly recognized categories of damages. Those figures, and a thorough discussion of those categories, can be found in the full text of the decision which, along with other Court of Claims decisions, is available through the Court of Claims Web site at <www.nyscourtofclaims.state.ny.us.>
In this edited version of the decision I address only the issue of my award of damages for loss of advocacy as separate and distinct from an award for loss of nurture and guidance. •
Lauren
Lauren was treated by three different health care professionals after the accident. The first and most brief term of treatment terminated when she was removed from her first custodial arrangement. The second health care professional, a developmental psychologist, treated her for less than two years. He observed a discrepancy between her IQ, which was in the above average range, and her academic performance, which was poor; Lauren tested at the second-grade level while in the third grade. He opined that it takes an incredible amount of nurture and guidance to help a child develop the skills and attitude necessary to close such an educational gap, as well as a tremendous amount of advocacy, with teachers and the school system, and maybe even health care professionals where necessary. The witness believed Lauren was not getting the nurturing, guidance and advocacy she needed. Biological parents would have a difficult time with such a task, but they would most likely have a bond with their child that would keep them from giving up. An intact and functioning family could make the difference in such a situation. However, it is a very difficult thing to expect another adult to shoulder this burden, especially with a child that is openly hostile.
Lauren was next treated by a licensed psychologist and her term of treatment was approximately one year. The doctor testified that Lauren misses a loving and nurturing support person. She was unable to get along with the rest of her family or make friends. She was also doing poorly in school and was not performing many age-appropriate self-care activities such as brushing her teeth and bathing. Unfortunately, even if Lauren had gotten to the point where she could accept her guardians in a parental role, they may not have been capable of filling this void as, by this time, they were “burned out” and overwhelmed by the situation themselves.
Several months into the therapy, the doctor concluded that Lauren was not getting past her grief over losing her family. *391 The conditions that normally allow an individual to do that were not present in her life following the accident. What would be a significant stressor for even an adult, a serious motor vehicle accident with fatalities, was, for Lauren, followed by a change in homes and schools. Such changes are, in and of themselves, significant stressors for any seven year old, even with the help and support of biological parents. Throughout all of this, Lauren lacked a connection with a nurturing parent figure that could help her cope and work through her grief.
Up to this point in her life, Lauren had three potential mother figures, all of whom left her in one way or another. The doctor opined that this fact was a significant reason for Lauren’s anger and feelings of rejection, as well as her inability to accept any guidance or nurture from anyone, except perhaps her maternal grandmother.
I find that the accident had an unquestionable impact on Lauren. The exhibits related to her therapy sessions all reference, on at least one occasion, a description of the accident. Lauren talked about the accident more often early on in the process (see exhibit 80C). The next event with an even greater degree of impact upon Lauren is the loss of her family, in particular, her mother. Finally, the most stressful events occurring postaccident were the changes in Lauren’s home environment. The claimants’ expert’s evaluation of Lauren in 1998 led him to conclude that Lauren possessed a stubborn and defiant demeanor. He diagnosed her with an adjustment disorder with disturbance of mood and conduct, a specific diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (4th ed 1994), requiring the existence of a life stressor causing the disturbance of conduct and mood. The symptoms can be present for six months or until the stressor is removed. Here, the initial stressor was the fatal motor vehicle accident. This was followed by the loss of her parents, then drastic changes in her living arrangements. Neither of these last two stressors have abated.
Testimony and records indicate that, before the accident, Lauren did not have any diagnosable disorder, nor did she require therapy or counseling. My own review of the evidence suggests that Lauren needed a lot of attention, applied inconsistent effort to her school work, was stubborn and frustrated easily (exhibit 86). I agree with claimants’ expert on this point. The fact that Lauren was stubborn and willful was not surprising given the biological family dynamics: four children, two of whom are handicapped, created stress. Parents would have less quality *392 time to spend with each child because their time together would have predominately been limit-setting and discipline. It was natural for Lauren to seek attention, but she appeared to function well within her biological family unit.
Immediately after the accident, Lauren struggled to adjust to her change in circumstances. Her school performance from October 1995 through approximately June 1998 was below average. Her behavior was willful and stubborn and she required individualized attention from her teachers. By the third grade, she was referred for testing to determine whether or not she had a learning disability.
Lauren was at the St. Andrew’s Country Day School for fourth grade in 1996. Her grades were poor and teachers’ comments were consistent with the prior years. Lauren repeated the fourth grade and a general improvement in her academic performance for that year was noted (exhibit 88). She moved to the Buffalo City School District for fifth and sixth grades and her academic performance was good. I found no comments reflecting the types of behavior noted earlier in her school career. I also note that the special services that had been identified as necessary in the third grade were not being provided. The school psychologist’s evaluation of Lauren in October 1999 noted that Lauren was doing well academically and requested that she no longer receive special assistance.
I find that Lauren will need assistance coping with the loss of nurturing and guidance as it is clear from the record before me that no one has stepped in to fill the role of a nurturing parental figure for her. I adopt the claimants’ expert’s opinion that psychotherapy sessions every other week for $115 per session through Lauren’s 30th birthday are fair and reasonable.
Paul Jr.
Paul Jr. suffers from the congenital disease, albinism, specifically tyrosinase negative oculocutaneous albinism, meaning his body makes very little, if any, of the pigment that colors one’s skin, hair and eyes. Claimant’s expert testified most people with any level of albinism have vision problems; the more severe the disease, the more severe the vision deficits. Paul Jr. is a more severe case in both aspects. Paul Jr. also possesses a nystagmus, meaning he suffers from an involuntary pendular movement of his eyes. Nystagmus is typical in all children born with poor vision, but Paul Jr.’s is quite pronounced, given the severity of his albinism. Children with nystagmus will have their vision change from day to day, depending on the frequency of the eye move *393 ment. In addition, mood swings caused by excitement, stress, nervousness or sleep deprivation also affect nystagmus, causing the pendulum effect of the eyes to become more rapid, further decreasing a patient’s vision. Paul Jr. also suffers from photo-phobia, or light sensitivity, and strabismus, a misalignment of the eyes or a “cross-eyed look.” Depending on which eye he is using to focus with, the other eye will always “cross.”
It was the doctor’s opinion that Paul Jr.’s ocular problems are permanent, and, although his best corrected vision would not deteriorate further, Paul Jr. is considered legally blind in the State of New York. Paul Jr. will eventually require a low vision aid due to the natural decline in his eyes’ ability to focus, a malady that occurs naturally as we get older. Regarding the strabismus, there is a surgery available that would help to align Paul Jr.’s eyes, though it would not correct his vision. In fact, according to the expert, there currently is no surgery available to correct Paul Jr.’s poor vision.
The various reports from the Blind Association of Western New York’s Visually Impaired Preschool Program[1] (VIP School) (exhibit 74) are the most objective and helpful evidence of Paul Jr.’s personal circumstances before the accident. I have relied extensively on their contents and used them in conjunction with the observations of the coordinator of preschool services[2] regarding Paul Jr.’s behavior and progress from 1991 through 1994.
His teacher observed that he was most interested in activities where he had free rein to explore and handle materials as he wished and was resistant to most activities led by, or accomplished one-on-one with, adults. The later remark would be an observation made by educators throughout Paul Jr.’s school career.
His teacher observed that Paul Jr. was having difficulty following through on adult requests, particularly during group activities. Group activities also posed a problem in that Paul Jr. would move away from the group or try to distract children and adults from the activity at hand. He possessed limited verbal skills, which made communication with the other children and adults difficult. When he became frustrated he would scream or cry and an adult would have to intervene.
*394 Paul Jr. did experience some improvement two years into the program when the number of days he attended increased. Mostly in his expressive speech, but he still preferred playing alone and could become easily frustrated, often resorting to tantrums. Paul Jr. also made “remarkable” gains during this time frame in the area of language skills with “[s]teady growth” in the gross and fine motor development and cognitive areas (exhibit 74 at 23).
However, Paul Jr.’s socialization skills were beginning to suffer in a more readily discernable way, “largely due to his inability to relate appropriately with his peers” (exhibit 74 at 16). It appears that his vision deficits contributed to this problem. Since he started school, he has had to hold objects anywhere from 4 to 6 inches from his face, no problem if you are talking about inanimate objects, quite a problem when meeting new people, or trying to traverse an open area. Paul Jr. would get physically close to other children in order to be able to view their features. This behavior created problems when Paul Jr. was introduced to children in the day care near the VIP School (a process called mainstreaming or integration) where getting that close could be construed as being aggressive and the other children would react negatively to him.
Paul Jr. had been consistently referred to as a bright and capable child over this time period but, by February 1994, education professionals began referring to him as a child with poor social skills. “He is intolerant of others, frustrates extremely easily and has difficulty attending to topics or activities not of his choosing. Paul displays a disrespectful attitude toward authority and does not accept responsibility for his actions. Overall he has a negative attitude toward school” (exhibit 74 at 38). This negative attitude dissipated when he was happily engaged in school activities of his own choosing, either alone or with a peer he tolerated.
Integration was not going well either, as he displayed inappropriate social behavior. Demonstrating self-control was also a problem. In addition, and for the first time, the social worker’s report indicates that Paul Jr.’s behavior at home was aggressive, particularly his interactions with his brother Nicholas and his sister Lauren. The recommended vision strategy was to help Paul Jr. learn “not to invade someone’s space.” He would need constant verbal reminders and physical redirection and could be offered other things to do, and especially to touch, as a way to help him deal with his vision deficits.
*395 While skill assessments supported the opinion that Paul Jr. was indeed a bright and capable child, his “distractability” impeded his progress in those areas. Barely four months later, it was recommended that Paul Jr. attend regular kindergarten in the neighborhood public school in a class with “structure” and “well defined expectations” with the support of a vision teacher and an occupational therapist. It was also noted that Paul Jr. would continue with the VIP Program throughout the summer to avoid “significant regression” in his development. During that time, Deborah LaMendola was in touch with the school to help arrange for an appropriate kindergarten setting.
Postaccident, Paul Jr. has been treated by several child psychologists and psychiatrists, as well as social workers. The fact that Paul Jr. lost his parents impeded his development to an even greater extent than his sister, Lauren, because, being younger, he missed even more of the opportunity to learn family and societal rules and values by modeling his parents. This modeling occurs because a child will try and earn his or her parents’ approval and have a fear of being rejected by the parent. Paul Jr.’s development was not just hindered by the loss of his parents. This loss, combined with his vision deficits, was devastating to his development, as he was unable to see clearly what behavior a new psychological parent was modeling.
The doctor’s course of treatment with Paul Jr. primarily focused on his behavior at school. Paul Jr. was performing well academically, but his behavior was disruptive. Paul Jr. tested as highly intelligent, yet he was struggling in school. What he really was missing was an advocate. This witness concluded that Paul Jr.’s problems with school started even before the accident, when the school district determined that Paul Jr. could be placed in a regular kindergarten. He testified that this was because the support services offered were insufficient to help Paul Jr. make such a transition. Paul Jr. needed a smaller class size so he could get help with his visual disability during class time.
Paul Jr. was next treated by a licensed psychologist in private practice. The doctor’s initial diagnosis for Paul Jr. was depression with behavioral issues. Paul Jr. also showed symptoms of Attention Deficit/Hyperactivity Disorder (ADHD) although the witness did not diagnose that condition. During this course of treatment, there was evidence that Paul Jr. first verbalized a desire to die because he had no parents. She opined that the loss of his parents caused a major disruption in Paul Jr.’s receiving the nurture and guidance needed to overcome his dis *396 abilities, but, even more importantly, he lost the advocacy for the services he needed.
I agree with the doctor’s assessment that children with special needs cause strain in a normal functioning biological family. Doctors’ appointments do not magically appear on calendars and services, such as occupational or vision therapy, do not just happen. Obtaining services for children with disabilities is a lot of work: phone calls, paperwork, meetings, research and even more time consuming, a consistency in working with a child at home. One hour of therapy, or even enrollment in the proper school, is not enough. What happens outside of the therapist’s office or the school will have the most impact on the success or failure of intervention. Thus, the loss of his parents made it less likely that Paul Jr. would develop and progress the same way he would have had his parents not died in the auto accident.
At trial, I had the benefit of testimony from claimants’ expert, a licensed psychologist who, since July 1981, has maintained a private practice in clinical child psychology and neuropsychology. She deals with children with ADHD and learning disabilities. In addition, defendant provided the testimony of a professor and director of a university school psychology program who has studied and written about the identification of children’s cognitive and behavioral deficits and therapeutic interventions.[3] I found both doctors extremely helpful in explaining the significance of the numerous postaccident Individualized Education Programs with the attached reports from the various service providers and the school records. Based on their testimony and my review of the exhibits, I conclude the following.
The trauma of the accident itself did not significantly impact Paul Jr.; I note that in all the testimony and evidence there is no diagnosis of posttraumatic stress disorder. What has had significant impact on him is, however, the loss of his mother, that is a parent/child relationship that provides emotional stability and consistent discipline and structure. That Paul Jr. presented a challenge to his biological parents is an understatement. Before the accident, he possessed a full-time caregiver, fully *397 engaged in his life and in addressing his needs. After the accident, he had to rely on well-intentioned family members that did not possess the tools, skills or ability to provide the type of emotional stability and consistent discipline and structure that Paul Jr. needed.
Paul Jr. was intelligent enough to progress successfully academically in the early grades despite the symptoms of Oppositional Defiant Disorder and ADHD. As the academics became more challenging, he was unable to cope, lacking the skills necessary to apply the required extra effort. I agree with the claimants’ psychologist that this is one of the more poignant examples of the devastating impact the loss of the nurture and guidance of a parent can have on a child. I also find that it is a perfect example of why the advocacy provided by a parent is so critical.
Inasmuch as Paul Jr. had counseling services to help him and his parents handle Paul Jr.’s unique challenges due to his vision deficit, and due to the fact that he continued to need such help after the accident, I find that psychotherapy sessions every week for $115 per session for the remainder of his life is fair and reasonable.
Loss of Parental Guidance
As stated at the beginning of this decision, the wrongful death award to both Lauren and Paul Jr. must address their claim for loss of parental guidance. Lauren had very specific memories of her family and strong opinions of her parents’ impact on her life. She recalled that she and her sister, Chesa, attended preschool at St. Benedict’s Church for two years. Their mother transported them. When Lauren reached kindergarten, Deborah taught her the importance of taking school seriously and that, as she grew older, school would be more challenging. Lauren testified that her mother was always involved in their education. Deborah kept in contact with each child’s teacher and checked on their progress. She was especially involved with Paul Jr.’s education. Lauren believed her mother had to be because, while the school was helping her brother, they were also teaching her mother how to help Paul Jr. at home. Lauren felt it made Deborah a better mother to Paul Jr. and helped her understand him better.
Lauren told me how her mother used to make clothes for her and her siblings and showed me pictures of some of the outfits. Lauren felt her mother encouraged Lauren’s creativity, providing art supplies and making the time and space for her to use *398 them. Lauren is very artistic and is proud of this fact because her mother was also a very artistic individual. Lauren testified that her mother always encouraged her and her siblings to “stick with” the activities that they enjoyed.
Lauren understood her two brothers’ condition of albinism and knew that it meant they needed to be careful. She testified that her mother always made sure that the boys wore their shirts, hats, glasses, and a good amount of sunscreen before going outside. Eventually, Lauren and Chesa could help by making sure as well, so that Nicholas and Paul Jr. could play outside with the rest of the children in the neighborhood.
Lauren remembers her father as a good-looking man who was always smiling and laughing. She remembers her mother having a soft voice and always telling the children how much she loved them and hugging them. She recalled that her father did that, as well. Lauren testified that both her parents taught their children right from wrong, manners, and to be on their best behavior. Deborah taught the children to always keep their rooms clean, and even taught Lauren how to clean the toilets. Whenever any or all of the children were ill, Lauren said that her mother would always tend to their needs and nurse them back to health.
The LaMendola family would take vacations often, including an annual camping trip to Sherkston Shore in Canada each summer. Holidays were usually spent at the family’s home on Berryman Drive, with both her father’s and mother’s families. Birthdays were always special occasions in the LaMendola household, according to Lauren. Deborah would always make a beautiful cake and put together party favors. Lauren said her mother used to read to the children at night and that, when the accident occurred in October 1995, she was in the middle of reading Pollyanna to them, and never got the chance to finish it. Lauren testified that she and her siblings even managed to enjoy bath time, as they had toys and books made especially for the bathtub.
Paul Jr.’s memories are not as detailed. He testified that he loved both his parents very much, especially his mother. Paul Jr. remembers Deborah as a very pretty woman with long hair and a nice shape. Paul Jr. testified that she was always “real nice.” He also testified that his immediate family was very close, and that today he and Lauren remain close, as they are the only members left.
Paul Jr. told the court that, when Deborah told him how much she loved him, it made him feel “really good,” and that she *399 would hug him and kiss him all the time. Deborah would tell Paul Jr. that he was handsome and that he was a “big boy,” which also made him feel good. Paul Jr. recalls Deborah nursing him back to health whenever he was sick. He remembers her loving him and understanding that he could not see very well. She would read things to Paul Jr. that he could not see very well himself (Paul Jr. described his vision as out of focus and blurry). Paul Jr. testified that he remembers his mother explaining his condition of albinism to him. Paul Jr. also testified that he remembers how Deborah used to read to the children before bed, and how bath time was always fun with all the toys and books they had for the bathtub. Paul Jr. does not remember too much about his father, but he did say that he remembers his father as a tall man who was always fun. He told me that he loved his father.
Paul Jr. testified that he remembers taking family vacations to places like Disney World in Florida, and going to see Sesame Street with his family. Paul Jr. also recalls spending summers camping at Sherkston Shore in Canada, and spending those days on the beach. He described these vacations as being a lot of fun. Paul Jr. remembers having a lot of toys to play with when he still lived with his parents, including a bicycle with training wheels. He remembers always having to be careful when going outdoors: always having to wear tinted glasses, a hat and sunscreen.
Paul Jr. testified that his mother taught him not to lie, to always be honest and tell the truth. He remembers going to weekly religion classes, and his parents giving him and his siblings religious videos to watch. If Paul Jr. needed discipline, his parents would tell him “not to do it” and sometimes he would get a spanking. Although Paul Jr. claims that these spankings never really hurt, that they were just enough “to get the picture” so he would know not to repeat the misbehavior. He recalled that his mother was always home waiting for them after school, and all the children had a familiar routine after school. He has no such routine today.
A family friend testified and offered several specific examples of the type of parenting, nurture and guidance that Paul Sr. and Deborah provided. Deborah was a member of the PTA and very involved with the Blind Association and United Way fund-raising. She also advocated for her children recalling a time when the two families were on vacation and Nicholas and Paul Jr. were not able to use the public swimming pool because they *400 were not allowed to wear hats or t-shirts in the water. Deborah was able to convince the management to let them wear the necessary protection so the boys could swim with the rest of the family. Lauren’s and Paul Jr.’s parents were also involved with their children’s education.
The VIP does not recruit or solicit students. At the time Paul Jr. enrolled, parents filed a Family Court petition, stating that they had a child with a disability, and the judge would give approval for the child to enter the VIP Program. The parents’ involvement with the program did not end once their child started school. The VIP also ran a program for parents, in which Paul Sr. and Deborah participated. Teachers worked closely with the family to develop a plan that parents could follow at home to reinforce what was learned and expected in school. The plan would address the student’s use of vision at home, as well as behavioral and cognitive issues. Teachers communicated with parents daily, either in person, by telephone or in writing. The VIP regularly evaluated students and reviewed evaluations with parents. The VIP’s vision professionals would work with parents so that they would know how to present materials and what things to follow through with at home — appropriate distances for coloring, cutting, pasting, and appropriate lighting conditions. During Paul Jr.’s tenure, parent training was done one-on-one, rather than in groups, as it was at the time of trial.
Deborah and Paul Sr. were always involved with the individualized training although it was particularly Deborah that participated on a daily basis. Paul Sr. was more likely to attend meetings and activities at the school. Deborah would come in, talk with the teachers and fill them in on things that were going on at home with Paul Jr. and explain how he was doing. Deborah and the teachers would also communicate about Paul Jr.’s medical appointments and successful classroom strategies that might also be employed at home.
The end of year summary for June 1991 in exhibit 74 memorialized Paul Jr.’s progress, remarkable for the fact that he had only been in the school since January 1991 for two mornings a week plus vision therapy once a week, they reported his skill levels as either age appropriate or only slightly below. Thus, it was clear that Paul Jr. had to be getting assistance outside of school because, unlike a seeing child who can mimic adult behavior and learn in that manner, a visually impaired child learns by having someone working closely with him to show him how to perform the skills. Deborah had been instructed to *401 talk with her son all the time and explain what was going on as a way to make up for his vision deficit. Developing his senses of hearing and touch was a way to help him compensate.
Deborah was involved with the Blind Association of Western New York and she was a member of its board. Deborah brought the perspective of a VIP Program parent to the board. Also, Deborah was involved in fund-raising activities, advocating for her children and for the VIP Program. Her work in these capacities kept the VIP School on the radar screen, so there was funding available and it made the school seem a little less remote. Deborah was also interviewed by the newspaper several times, talking about the program, the preschool, and providing information on albinism, particularly the need for early intervention and the benefits of getting children involved in these programs. She was often a visible advocate for the VIP School and once Deborah brought the president of the Blind Association to the school to provide a firsthand experience of how the school operated. She also made sure that the Association president was invited to the VIP graduations, which helped parents see that the agency hierarchy was interested in their children.
The entire LaMendola family would attend the school’s events and activities together. Deborah always talked about all her children. She would bring Paul Jr.’s siblings to the playground at the end of their school day. It was not just Paul Jr. who was always clean and neat, but all the children appeared that way.
Paul Sr. and Deborah LaMendola were involved and caring parents and, regardless of the love they felt for their children, the stress of raising four children on one income, with two of the children having special needs, was evident. All the children had some level of problems at school and, despite Deborah’s best efforts, there was often not much structure provided in the home (exhibit 84).
In late 1994, Deborah sought assistance for two problems: Paul Jr.’s behavior in school and at home, and lack of support for the parents in managing Paul Jr.’s behavior. Deborah reported that her son Nicholas had been recently diagnosed with ADHA and that she believed her husband suffered from ADHA-like symptoms, as he was easily frustrated. This became particularly apparent as they struggled to combine their two different parenting styles. One of the treatment goals at that time was to decrease stress for Deborah. The objectives were to provide support, “emergency phone numbers,” refer Deborah to a parenting class and to a counselor to treat her own problems (exhibit 80A).
*402 Also at this time, the tension level at home escalated to the point where Deborah felt it necessary to call the police and seek an order of protection. She believed that her husband had been exhibiting controlling behavior over her daily routine and had choked Paul Jr. Child Protective Services became involved and it was noted that both parents would be seeking marital counseling at Jewish Family Services, but that they were also considering divorce (exhibit 80A). I note that Paul Sr. took Paul Jr. to one of the counseling sessions after the choking incident and a few times thereafter. By March of 1995, it appeared that Deborah was in treatment for her own problems and by June 1995, the treatment notes indicate that marital counseling was no longer occurring (exhibit 80A).
During this time period, it became apparent that the family was experiencing financial problems as well. Paul Sr. had encumbered the family residence with a second mortgage to finance a business venture that, in turn, fell through. Paul Sr. and Deborah sold the family residence, but were able to relocate to a smaller, less expensive home on the same street to keep their children in the same school. This happened in either August or September 1995, just weeks before the accident.
It is clear to me that Deborah was the main source of nurture and guidance for her children. She sought assistance when necessary for the children, and for herself, as well. She fought to keep her children in the same school and neighborhood and she fought to keep her marriage healthy. Her role went beyond nurture and guidance because of the circumstances — raising four children, two of whom had special needs. She became their primary advocate for services. I make two awards, one for nurture and guidance for Lauren, Paul Jr. and Marie (discussed in the unedited version of this decision) and the second for the loss of parental advocacy for Lauren and Paul Jr. To Lauren, I award a total of $450,000 for loss of nurture and guidance and a total of $200,000 for loss of advocacy. For Paul Jr., I award a total of $1,500,000 for loss of nurture and guidance and a total of $3,000,000 for loss of advocacy.
[Portions of opinion omitted for purposes of publication.]

. This was the name of the school when Paul Jr. attended. It is now the Elizabeth Purist Ohnstead MD Center for the Visually Impaired.

. She has run the preschool program since August 1992 and possesses a Master’s in Education, a Master’s in Special Education, and an Administrative Degree in Special Education.

. Defendant moved to have its expert’s written reports received into evidence (exhibits Ul, 12). I have reviewed counsels’ arguments, both for and against, as well as the experts’ reports. Although the contents of the reports are relevant, admission as evidence would be unnecessarily repetitive, as this expert testified extensively on their contents and was subjected to a lengthy and thorough cross-examination.